788 So.2d 1173 (2001)
In re MEDICAL REVIEW PANEL FOR the CLAIM OF Maria MOSES.
No. 2000-C-2643.
Supreme Court of Louisiana.
May 25, 2001.
*1174 Richard P. Ieyoub, Attorney General, John S. Coulter, Baton Rouge, Counsel for Applicant.
P. Charles Calahan, New Iberia, Counsel for Respondent.
Carlton Jones, III, Larry M. Roedel, David A. Woolridge, Jr., Baton Rouge, Counsel for Louisiana Patient's Compensation Fund (Amicus Curiae).
CIACCIO, Justice pro tempore.[*]
This is a medical malpractice action. We granted certiorari in this case to resolve a novel legal issue presented based on the undisputed facts of this case. The issue presented is two-pronged: (i) whether the continuing tort doctrine can be invoked to enlarge the prescriptive period under La.Rev.Stat. 9:5628; and, if so, (ii) whether a necessary requirement for invoking the continuing tort doctrine in this context is continuing negligent treatment.

*1175 Facts

On September 3, 1991, Maria Moses, who was pregnant at the time, had a McDonald cerclage surgically attached to her cervix; this was a prophylactic procedure done to prevent premature delivery.[1] The procedure was performed at University Medical Center in Lafayette (UMC). On December 30, 1991, the cerclage was removed at UMC, yet some of the metal stitches that had been used to attach the device to Moses' cervix were not. On July 16, 1996, during a routine pap smear exam at Iberia Parish Health Unit, the remaining stitches were discovered. On September 5, 1996, the stitches were surgically removed at UMC.
On July 2, 1997,[2] Moses filed a request to invoke a medical review panel with the Commissioner of Administration regarding the alleged malpractice of UMC and Louisiana Health Care Authority (LHCA).[3] Moses alleges the remaining stitches caused her to suffer from cramping, longer menstrual cycles, anxiety attacks, nervousness, headaches, and uncomfortable sexual relations. On October 27, 1997, LHCA and UMC filed a petition to institute discovery in the Nineteenth Judicial District Court under La.Rev.Stat. 40:1299.39.1 D(4).[4] On August 24, 1998, UMC filed a *1176 peremptory exception of prescription in the pending discovery proceeding. The trial court sustained the exception.[5]
Reversing and remanding for a continuation of the medical review panel proceeding, a divided panel of the appellate court, in an unpublished opinion, accepted Moses' argument that prescription did not commence to run until September 5, 1996, when the remaining stitches were removed. The court noted that the basis for delaying the commencement of prescription running was not the special discovery rule set forth in La.Rev.Stat. 9:5628, but rather the continuing tort doctrine as described by this court in South Central Bell Telephone Co. v. Texaco, Inc., 418 So.2d 531 (La.1982), and as applied in the medical malpractice setting in Bellard v. Biddle, 98-1502 (La.App. 3rd Cir.3/17/99), 734 So.2d 733.[6] The court of appeal noted the split among the circuits on the issue of whether the continuing tort doctrine applies in the medical malpractice setting as a defense against the three-year discovery rule of La.Rev.Stat. 9:5628 absent continuing contact or treatment. Particularly, the First Circuit in this case noted the contrary holdings by the Fourth and Second Circuits in Romaguera v. Overby, 97-1654 (La.App. 4th Cir.3/4/98), 709 So.2d 266, and Jeter v. Shamblin, 32,618 (La.App. 2nd Cir.2/1/00), 750 So.2d 521, respectively, rejecting the continuing tort defense; whereas, it cited the Third Circuit's holding in Bellard, accepting that defense. Explaining the reasoning in Bellard, finding that reasoning persuasive and analogizing the facts of this case to Bellard, the intermediate court stated:
In Bellard, the court found that, assuming the plaintiff's problems were caused by the piece of rubber left in her abdomen, the rubber itself caused harm progressively, just as did the leaking gas tanks in South Central Bell. Thus, the court concluded that the alleged malpractice constituted a continuing tort. Applying South Central Bell, the court found the existence of the rubber and the harm it allegedly caused to be continuing up to the time it was removed and the damage abated and, thus, plaintiff's claim was timely.
We find the instant case to be directly on point with Bellard. The actual existence of the metal sutures on plaintiff's cervix was of a continuing nature and caused physical damage to the plaintiff on a daily basis. We believe that the accrual of prescription is suspended under facts such as those presented here, where the plaintiff has suffered continuous damages from day to day caused by the unknown presence of metal sutures left in her body. In plaintiff's handwritten responses to interrogatories, which were introduced into evidence, she indicated that she went to all of her doctor's appointments after her baby was born in 1991, and "the doctors never mention[ed] [that the sutures] were there." In this case, the harm caused by the daily presence of the sutures continued *1177 up to the time they were discovered and subsequently removed on September 5, 1996. (citations omitted).
The court of appeal thus held that prescription did not commence to run until September 5, 1996, when the remaining stitches were removed, rendering Moses' claim filed in July 1997 with the Commissioner timely.[7]
Citing this court's holding in Crump v. Sabine River Authority, 98-2326 (La.6/29/99), 737 So.2d 720, that a continuing tort does not result from the continuation of the ill effects of an original, wrongful act, a dissenting appellate court judge opined that the continuing tort doctrine is inapplicable in this case, stating:
In this case, the acts of malpractice were the UMC physicians' failure to remove all of the stitches from the plaintiff's cervix on December 30, 1991, and their failure (assuming UMC physicians conducted plaintiff's post-partum examinations) to detect the unremoved stitches during her post-partum examinations. These original acts caused the continuing ill effects suffered by plaintiff. Once plaintiff ceased to have a doctor-patient relationship with the UMC staff, there was no continuing duty or continuing breach of duty by them which serves to interrupt the prescriptive period.
Although the 3-year outside limit for filing medical malpractice claims is harsh in situations such as the one presented in this case, La. R.S. 9:5628 is clear.[8]
On defendant-UMC's application, we granted certiorari to address the novel legal issue presented. 00-2643 (La.1/26/01), 781 So.2d 567.[9]

Burden of Proof
Ordinarily, the party pleading prescription bears the burden of proving the claim has prescribed. However, when the face of the petition reveals that the plaintiff's claim has prescribed, the burden shifts to the plaintiff to demonstrate prescription was suspended or interrupted. Lima v. Schmidt, 595 So.2d 624 (La.1992). In a medical malpractice action in which the plaintiff's application for a medical review panel serves initially as the petition and functions to suspend the prescription from running, the health care provider can assert a prescription exception in a court of competent jurisdiction and proper venue at any time without regard to whether the medical review panel process is complete. La.Rev.Stat. 40:1299.39.1 B(2)(a). Such is the procedural history of this case.
Given the procedural posture of this case, we resolve the issue of the placement of the burden of proof based on a logical application of the general principle that the party asserting a suspension or interruption *1178 of prescription bears the burden. Since the party asserting a suspension is plaintiff, logic dictates that plaintiff have the burden of proof.
Plaintiff urges, supported by the court of appeal, that she met that burden by establishing that the remaining stitches constituted a continuing tort (more precisely a continuing trespass) analogous to the leaking tanks in South Central Bell. It follows, plaintiff urges, that prescription was suspended until the remaining stitches were removed. Plaintiff further urges that continuing treatment is, at best, an alternative means of establishing a continuing tort and has never been held to be the sole means.
Defendant counters that for there to be a continuing tort under Crump continuing treatment is essential. Stressing the lack of continuing treatment, defendant submits that there was no continuing tort and that plaintiff's claim is clearly prescribed.
The main source of disagreement between the parties is whether continuing treatment is required for a continuing tort. A more fundamental issue presented is whether the continuing tort doctrine can be invoked to enlarge the prescriptive period under La.Rev.Stat. 9:5628.

Analysis
The starting point of our analysis is the governing statute, La.Rev.Stat. 9:5628, which provides:
A. No action for damages for injury or death against any physician, chiropractor, nurse, licensed midwife practitioner, dentist, psychologist, optometrist, hospital duly licensed under the laws of this state, or community blood center or tissue bank as defined in R.S. 40:1299.41(A), whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission or neglect.

B. The provisions of this Section shall apply to all persons whether or not infirm or under disability of any kind and including minors and interdicts. (Emphasis supplied.)
La.Rev.Stat. 9:5628 is a tripartite prescription provision.
First, a one-year prescription period (which parallels the general tort period) is the general rule, which applies to all types of medical malpractice actions. Under this general rule, such actions prescribe one year from the date of the alleged act, omission or neglect. This rule applies when the damages are immediately apparent.
Second, in cases involving damages that are not immediately apparent, a discovery exception to the general rule is codified. The discovery exception embodied in Section 5628 is a codification of the fourth category of contra non valentem for cases in which the cause of action is not immediately knowable.[10] Under this discovery *1179 rule, such actions prescribe one year from the date of discovery of the alleged act, omission or neglect.
Third, an overall limitation is placed on cases otherwise falling within the discovery rule. That overall limitation is the underscored portion of Section 5628, which provides that "in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission or neglect." La.Rev. Stat. 9:5628 (emphasis supplied). Translated, this means that "the contra non valentem type of exception to prescription embodied in the discovery rule is expressly made inapplicable after three years from the alleged injury causing act, omission or neglect." Boutte v. Jefferson Parish Hospital Service District No. 1, 99-2402 at p. 5 (La.4/11/00), 759 So.2d 45, 49. "Superimposed upon [the discovery rule], however, is an overall limitation upon the discovery rule's operation to a period of three years from the date of the alleged act, omission or neglect." Branch v. Willis-Knighton Medical Center, 92-3086 at p. 17 (La.4/28/94), 636 So.2d 211, 216.
Summarizing, Section 5628 is a hybrid statute, providing both a one-year prescriptive period, including an incorporation of the discovery rule, and a three-year repose period; the latter repose rule acts to cut off the discovery rule incorporated into the former prescriptive period. This type of hybrid statute "not only limits the time following discovery during which the plaintiff must institute his action, but also sets an outer or overall limitation, one based on the length of the period following the negligent act, beyond which the action is barred, regardless of subsequent discovery." 1 David W. Louissell & Harold Williams, Medical Malpractice ¶ 13.02[2][b] at 13-40 (1999)(citing Louisiana's overall limit of three years); Benge v. Davis, 553 A.2d 1180 (Del.1989)(describing similar hybrid statute as codifying the "inherently unknowable" injury rule known as the "time of discovery rule," and limiting it to a finite three-year period). The repose rule functions as "a counter rule to the accrual-discovery rule by adding an alternative prescriptive period which begins running at the time of the defendant's act rather than at the time harm was inflicted or discovered." 1 Dan B. Dobbs, The Law of Torts § 219 at 557 (2001)(citing Branch, supra). Under Section 5628 this means that plaintiff gets the *1180 benefit of the discovery rule, but only during the first three years following the alleged act of malpractice.
Because the repose rule imposes an overall limit on the suspension of prescription allowed under the discovery rule, it shifts the focus for determining when the prescription clock starts running from the date of the plaintiff's discovery to the date of the defendant's alleged act, omission or neglect. "When the defendant's act rather than the plaintiff's discovery starts the statute running, the defendant's continuing intentional harms and continuing negligence present a difficult problem. His continuing failure to act can be even more puzzling." Dobbs, supra § 220 at 561 (emphasis supplied).
Plaintiff's position is that the continuing negligent act was defendant's continuing failure to act (omission), coupled with defendant's duty to remove the trespassing object (the remaining stitches). We begin by analyzing the thorny issue of whether the continuing conduct requirement can consist of either a continuing omission or a failure to remedy the harm caused by the initial wrongful conduct, and, if so, whether such continuing tort can be invoked to enlarge the repose period under Section 5628.

Continuing Omission
We recently held that "for there to be a continuing tort there must be a continuing duty owed to the plaintiff and a continuing breach of that duty by the defendant. 54 C.J.S. Limitations of Actions § 177 (1987)." Crump, 98-2326 at p. 10, 737 So.2d at 728. Rejecting the contention that the continuing breach of duty could consist of the defendant's failure to remedy the harm caused by the initial tortious conduct, we stated that "the breach of the duty to right a wrong and make the plaintiff whole simply cannot be a continuing wrong which suspends the running of prescription, as that is the purpose of any lawsuit and the obligation of every tortfeasor." 98-2326 at p. 10, 737 So.2d at 729. An exception, however, has been recognized when a special relationship, such as patient-physician or attorney-client, exists between the parties; the continuation of a special relationship offers the possibility of correction of an injury and thus may postpone the running of prescription. 54 C.J.S. Limitations of Actions § 177 (1987). "As long as the patient remains in [the physician's] care, she could reasonably expect a correction of the diagnosis or treatment, so again, the defendant in a sense continues to be negligent." Dobbs, supra § 220 at 561.
In Taylor v. Giddens, 618 So.2d 834 (La.1993), we noted the possibility that continued treatment combined with a continued professional relationship could result in a suspension of prescription. We further noted that two appellate cases have recognized this principle, which is based on the fact the continuing relationship is "likely to hinder the patient's inclination to sue." 618 So.2d at 843 (citing Trainor v. Young, 561 So.2d 722 (La.App. 2d Cir.), writs denied, 567 So.2d 1124, 1125 (La.1990), and Abrams v. Herbert, 590 So.2d 1291 (La.App. 1st Cir.1991)). Because the record before us in Taylor revealed that the malpractice victim's relationship with the doctor was no more than "perfunctory," we declined to address the issue of whether prescription could be suspended based on the doctor's continued treatment of the patient.
As a matter of semantics, Louisiana appellate courts have indicated that this type of tolling of prescription that possibly arises out of the continuation of such a special relationship is not based on the continuing tort concept; rather, it is based on the third category of contra non valentem where the defendant himself has done some act effectively preventing the *1181 plaintiff from availing himself of his cause of action. See Wang v. Broussard, 96-2719 (La.App. 1st Cir.2/20/98), 708 So.2d 487, writ denied, 98-1166 (La.6/19/98), 720 So.2d 1213 (citing Succession of Smith v. Kavanaugh, Pierson and Talley, 565 So.2d 990, 995 (La.App. 1st Cir.), writ denied, 567 So.2d 1125 (La.1990)); see also Acosta v. Campbell, 98-2538 (La.App. 4th Cir.8/11/99), 744 So.2d 112, writ denied, 99-2651 (La.11/19/99), 749 So.2d 683 (noting that no Louisiana case has held that prescription can be extended solely, or primarily, because of continued relationship and describing this argument as falling squarely within third category).
Dissenting in Whitnell v. Silverman, 95-0112 (La.12/6/96), 686 So.2d 23, Justice Lemmon explained how the continuing tort doctrine can apply in this context under this third category of contra non valentem, stating:
[T]he doctor, who is in a fiduciary relationship with the plaintiff, has a continuing duty to disclose the known material information, not only on the day that the doctor learns of the information, but also on every day thereafter until the patient learns the information from another source. Breach of this continuing duty is analogous to a continuing tort, and a new cause of action (with a new prescriptive or peremptive period) arises each day that the doctor fails to disclose... the material information known by the doctor but not by the patient, and thereby effectually prevents the patient from availing himself or herself of the cause of action.
95-0122 at p. 5-6, 686 So.2d at 34. This was the historical basis for the rule that tolled prescription until the relationship terminated; particularly:
[A]s long as the relationship of physician and patient continues, the physician is guilty of malpractice if he does not right any wrong he has committed or undo any harm he has inflicted. Under this latter theory, the cause of action against the physician would arise at the conclusion of the relationshipthe conclusion of the last opportunity to cure effects of the wrongful act.... [T]he malpractice is regarded as a continuing tort because of the persistence of the physician in continuing and/or in repeating the wrongful treatment.
Louissell & Williams, supra ¶ 13.02[4] at 13-61. Under the termination rule, when the health care provider continues to treat the patient after making an error and failing to discover it, "the health care provider is deemed negligent both at the time of the malpractice and at all subsequent examinations; thus, the limitation period does not commence until the termination of the patient's relationship with the health care provider." Clay B. Tousey, Jr., Comment, An Analysis of State Legislative Responses to the Medical Malpractice Crisis, 1975 Duke 1417, 1431.
The termination rule was traced to a 1902 Ohio Supreme Court case involving a sponge left in the patient's abdomen following an appendectomy. See Dana David Peck, Comment, The Continuous Treatment Doctrine: A Toll on the Statute of Limitations for Medical Malpractice in New York, 49 Albany L.Rev. 64, 68 n. 19 (1984)(citing Gillette v. Tucker, 67 Ohio St. 106, 65 N.E. 865 (1902)). In Gillette, the court rejected the argument that the case involved a single act of malpractice, reasoning that the defendant-surgeon's duty to remove the sponge "was a continuous obligation, and recognized by the law, and it was alive and binding so long as the relation of physician and patient subsisted... Neglect of this duty imposed by continuous obligation was a continuous and daily breach of the same, and as the facts show caused continuous increasing, daily, and uninterrupted injury." 67 Ohio St. at 127, 65 N.E. at 870. The court thus cited *1182 two justifications for finding a continuing tort: (i) the continuing contractual relationship between the parties, and (ii) the theory that the plaintiff was continually damaged during the time the sponge was in her abdomen.[11]
The termination rule theorizes that the continuing injury is a tort that continues beyond the time of the occurrence until it is either discovered or the relationship terminates, whichever occurs earlier. Under the termination rule, a single negligent act is conceptualized as giving rise to a continuing tort by "view[ing] the injury as continuing and perceiv[ing] the injury as not accruing [and prescription thus not commencing to run] until a damaged party discovers the wrong." Susan S. Septimus, The Concept of Continuous Tort as Applied to Medical Malpractice: Sleeping Beauty for Plaintiff, Slumbering Beast for Defendant, 22 Tort & Ins. L.J. 71, 89 (1986). Given its focus on the principle that the injury continues beyond occurrence until when the harm is discovered or when the relationship of the parties is terminated, the termination rule is, in essence, a "particularized application of the discovery rule. The rule presumes, for policy reasons, that a patient has not discovered an injury during the time medical treatment continues." Stanbury v. Bacardi, 953 S.W.2d 671, 676 (Tenn.1997)(concluding rule outlived necessity given comprehensive medical malpractice statute of limitation).
By statute, however, the Legislatures in many jurisdictions, including Louisiana, have placed overall limitations for asserting a claim based on such discovery rule. "These statutes of repose run from the specific date of occurrence and serve to limit the concept of continuing injury." Septimus, supra at 78 (emphasis supplied). Such repose rules serve to set a fixed time period, three years in Louisiana, after which a plaintiff's right to be compensated for such not immediately knowable injuries is cut off. By their nature, statutes of repose "reimpose on some plaintiffs the hardship of having a claim extinguished before it is discovered, or perhaps before it even exists." W. Page Keeton, et al., Prosser and Keeton on Torts § 30 at 168 (5th ed.1984). This is especially so with foreign objects. While some state legislatures have carved out an express discovery rule exception for foreign objects, the Louisiana Legislature has not. While harsh, Section 5628 precludes our recognizing the termination rule type continuing tort as a basis for enlarging the three-year cutoff on the discovery rule based on the theory of a continuing injury to plaintiff.
Attempting to avoid the three-year cutoff, plaintiff urges, supported by the court of appeal, that this case involves a continuing trespass; specifically, she contends that the continued presence of the remaining stitches on her cervix acted as an ongoing wrong, causing continuous daily harm until discovered and removed. Until then, she urges prescription did not commence to run. While we conclude that the appellate court in this case, and in Bellard, supra, erroneously applied a form of continuing tort theory based on the termination rule and a theory of continuing omission, for completeness sake, we address plaintiff's continuing trespass argument.

*1183 Continuing Trespass Origin of Continuing Tort Doctrine

The continuing tort doctrine originated in trespass and nuisance cases. In those property law cases, the concept served to enlarge the period of tort liability by considering the relationship between the defendant's course of conduct and the continued ill effects of such conduct on the plaintiff. In those cases, a distinction is drawn between continuous and discontinuous operating causes; specifically:
When the operating cause of the injury is continuous, giving rise to successive damages, prescription begins to run from the day the damage was completed and the owner acquired, or should have acquired, knowledge of the damage. See South Central Bell Telephone Co. v. Texaco, Inc., 418 So.2d 531 (La.1982), and cases cited therein. When the operating cause of the injury is discontinuous, there is a multiplicity of causes of action and of corresponding prescriptive periods. Prescription is completed as to each injury, and the corresponding action is barred, upon the passage of one year from the day the owner acquired, or should have acquired, knowledge of the damage. See A.N. Yiannopoulos, Predial Servitudes, § 63 (1982).
Official Revision Comment (c) to LSA-C.C. Art. 3493 (1983).
Recently, we clarified the continuing tort doctrine in a property law case, Crump v. Sabine River Authority, 98-2326 (La.6/29/99), 737 So.2d 720. We held that "[a] continuing tort is occasioned by [the continual] unlawful acts, not the continuation of the ill effects of an original, wrongful act." 98-2326 at p. 9, 737 So.2d at 728. Addressing the requirement that there be continuous conduct by the defendant, we stated that "[t]he continuous conduct contemplated in a continuing tort must be tortious and must be the operating cause of the injury." 98-2326 at p. 11, 737 So.2d at 729 n. 7.
When a defendant's damage-causing act is completed, the existence of continuing damages to a plaintiff, even progressively worsening damages, does not present successive causes of action accruing because of a continuing tort. Derbofen v. T.L. James & Co., 355 So.2d 963 (La.App. 4th Cir.1977), writs denied, 357 So.2d 1156, 1168 (La.), cert. denied, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 257 (1978).
The continuing tort doctrine has been invoked primarily in the property law context; only a handful of Louisiana cases have invoked it in other contexts. Two cases are illustrative: Wilson v. Hartzman, 373 So.2d 204 (La.App. 4th Cir.), writ denied, 376 So.2d 961 (La.1979), which involved an occupational disease; and Bustamento v. Tucker, 607 So.2d 532 (La.1992), which involved an intentional infliction of emotional distress claim.
In Wilson, the plaintiff was subject to continuous exposure to silica dust in the workplace for over a decade, which resulted in him contracting silicosis. In reversing the trial court's holding dismissing his claim as prescribed, the appellate court invoked the continuing tort doctrine. Writing for the court, Justice (then Judge) Lemmon reasoned:
[T]he continuing and repeated wrongful acts are to be regarded as a single wrong which gives rise to and is cognizable in a single action, rather than a series of successive actions. Therefore, the date for commencing the accrual of prescription of an action based on the single wrong is the date of the last wrongful exposure, and the single action may be filed within the prescriptive period reckoning from the cessation of the continuing wrongful acts. See 51 Am. *1184 Jur.2d, Limitations of Actions, § 137 (1970).
373 So.2d at 207.[12]
Similarly, in Bustamento, we characterized an entire course of harassment as a single cause of action with prescription running from the date of the last incident. Noting that the continuous nature of the alleged conduct had the dual effect of rendering such conduct tortious and tolling the commencement of prescription, we reasoned:
It would be entirely inconsistent to say that such cumulative, continuous acts constitute a tort, but that prescription runs from the date of each distinct act. Indeed, it would be most difficult to pin-point the specific moment in time when such continuous conduct became sufficiently outrageous, and such continuing damages rose to the level of severity, to become actionable and thus to commence the running of prescription. Thus, we find Tucker's alleged actions constitute a pattern of conduct analogous to the continuing trespass or nuisance situations discussed in South Central Bell, supra, and we find the practical rule adopted in those property damage cases that prescription does not run until continuous conduct is abated applies.
607 So.2d at 538-39. Summarizing, we stated that "when the acts or conduct are continuous on an almost daily basis, by the same actor, of the same nature, and the conduct becomes tortious and actionable because of its continuous, cumulative, synergistic nature, then prescription does not commence until the last act occurs or the conduct is abated." 607 So.2d at 542.
Similar logic has been recited as supporting application of the continuing tort doctrine, albeit under the different rubric of continuing treatment, in the medical malpractice setting when "the medical negligence consists of a course of conduct, a series of negligent acts, or a continuing impropriety of treatment." Louissell & Williams, supra ¶ 13.02[3] at 13-47.[13] As *1185 one commentator notes:
Certainly it would not be equitable to bar a plaintiff who, for example, has been subjected to a series of radiation treatments in which the radiologist negligently and repeatedly administered an overdosage, simply because the plaintiff is unable to identify the one treatment that produced his injury. Indeed, in such a situation no single treatment did cause the harm; rather, it was the result of several treatments, a cumulative effect.
Louissell & Williams, supra ¶ 13.02[3] at 13-52. Stated otherwise, "the classic case of the continuum of negligent treatment... [is one] in which a patient is gravely injured because of negligent or unnecessary exposure to x-ray radiation or administration of medication over a span of years." Langner v. Simpson, 533 N.W.2d 511, 522 (Iowa 1995). Louisiana appellate courts have recognized a continuing tort based on each of these types of classic continuum of negligent treatment cases.
A series of radiation treatments negligently administered to a plaintiff who was misdiagnosed with cancer that allegedly resulted in the plaintiffs death was held to be a continuing tort in Winder v. Avet, 613 So.2d 199 (La.App. 1st Cir.1992), writs denied, 617 So.2d 907 (La.1983).[14] Similarly, a course of administration of narcotic drugs spanning several years that allegedly resulted in addiction was held to be a continuing tort in Chiasson v. Doe, 618 So.2d 38 (La.App. 3rd Cir.), writ denied, 624 So.2d 1225 (La.1993).
Another illustration of a course of narcotic drug administration that was held to be a continuing tort is presented in Page v. United States, 729 F.2d 818 (D.C.Cir.1984). Describing the continuing tort concept to mean that "`when a tort involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the tortious conduct ceases,'" the federal court invoked the continuing tort concept to toll the statutory time limit until the termination of the continued drug therapy. 729 F.2d at 821. Noting the difficulty of pinpointing a single incident in a continuous chain of tortious activity as the cause of significant harm and stressing the cumulative effect of the conduct as actionable, the court stated:
We view the injury claimed by Page as gradual, resulting from the cumulative impact of years of allegedly tortious drug treatment. To us it seems unrealistic to regard each prescription of drugs as the cause of a separate injury, or as a separate tortious act triggering a new limitation period. Page charges precisely *1186 the sort of continuous conduct accreting physical and mental injury that justifies characterization as a continuing tort. Resultingly, the cause of action Page stakes on continuous drug treatment did not accrue, and the statutory limitations did not come into play, until the allegedly tortious conduct came to a halt in 1980.
729 F.2d at 822-23.[15] The Page court, however, distinguished the continuing tort doctrine it invoked based on the ongoing tortious conduct from the discovery rule that applies when a plaintiff's injury continues or manifests after the defendant's tortious conduct ceases. 729 F.2d at 821 n. 23.
A common characteristic shared by Winder, Chiasson, and Page, is that they present a plaintiff who was harmed as a result of the cumulative effect of a course of negligent treatment, not by a single act of malpractice. This characteristic was also present in both Wilson and Bustamento, the two cases discussed above involving occupational disease and intentional infliction of emotional distress, respectively, in which a continuing tort was found to exist. This characteristic clearly is lacking in this case; neither cumulative damage to plaintiff, nor continuing treatment by defendant are present; rather, this case involves a single act of medical malpractice.

Bellard v. Biddle caseSingle Act of Malpractice

Bellard v. Biddle, 98-1502 (La.App. 3rd Cir.3/17/99), 734 So.2d 733, the case on which the court of appeal in this case heavily relied to find a continuing tort, involved a single act of malpractice. In Bellard, as in this case, the defendant's negligence consisted of the single act of failing to remove a suture. Although the plaintiff's suit was filed within a year of discovering the suture, the suit was filed more than three years after the act of malpractice and more than three years after the defendant last treated the plaintiff.
Adopting a continuing trespass theory, the Third Circuit reasoned that the rubber suture the defendant negligently left in the plaintiff's abdomen served as a continuing trespass analogous to the leaking tanks in South Central Bell and concluded that "prescription does not begin to run in the case of a continuing trespass until the offending acts are abated." 98-1502 at p. 4, 734 So.2d at 735. That this was the reasoning on which the Bellard court based its logic is further evidenced by the court's additional comment that "[t]he tortious conduct complained of is not only an affirmative act, but also a continuing omission on the part of Dr. Biddle." Id. Dr. Biddle's omissions, according to the plaintiffs allegations, were his failure to look for, detect, and remove the suture.
That reasoning tracks the original termination of treatment rule, which theorized that the continuing injury resulting from a single act of malpractice, such as leaving a sponge inside a patient, was a continuing tort. That theory, as discussed earlier, was superseded by the three-year repose rule, save possibly for the fraudulent concealment exception. When, as in Bellard, supra and in this case, the negligence consists of simply "a single identifiable act," applying the rule that prescription runs from the date of the wrongful act is "simple, straightforward and equitable," and thus the rationale for invoking a continuing tort type doctrine to enlarge the statutory time frame for bringing a medical malpractice suit is lacking. Louissell & Williams, supra ¶ 13.02[3] at 13-47; E. Scott Hackenberg, Comment, Puttering About in a *1187 Small Land: Louisiana Revised Statutes 9:5628 and Judicial Responses to the Plight of the Medical Malpractice Victim, 50 La. L.Rev. 815, 822 n. 24 (1990)(suggesting continuing tort theory be adopted for cases in which negligent treatment continues over period of time, yet noting cases involving single surgical procedure present "a clear act, omission or neglect; a clear point from which prescription will run.")
The reasoning in Bellard is erroneous in three respects. First, it fails to apply the three-year overall limitation on the discovery rule to the single act of malpractice. Second, it applies a theory of continued omissions contrary to our prior jurisprudence limiting that theory to instances of fraudulent concealment. Finally, it departs from our continuing tort jurisprudence requiring for a continuing tort not only continuing damages, but also continuing tortious conduct. We thus overrule Bellard.

Conclusion
Defendant committed a "single breach of duty" to remove the remaining stitches, which was known neither by defendant nor by plaintiff, and the discovery rule (the fourth category of contra non valentem) would apply to suspend prescription indefinitely but for the repose rule of Section 5628, imposing a three-year overall limitation. This limitation, while harsh, is clear, and we are bound to follow it.
Concluding, we answer the questions noted at the outset of this opinion. First, we leave open the question of whether the continuing tort doctrine can be invoked to enlarge the three-year repose period. Nonetheless, we hold that given this court's continuing tort jurisprudence, coupled with the clear legislative intent set forth in Section 5628 to impose a fixed time limit on the discovery rule, continued tortious treatment or conduct on defendant's part is an essential element for possibly invoking the continuing tort doctrine in this context. Given the lack of such treatment or conduct in this case within the three-year repose period, we conclude that plaintiff's claim prescribed.

Decree
For the foregoing reasons, the judgment of the court of appeal is reversed and the judgment of the trial court sustaining the exception of prescription and, as a result, dissolving the medical review panel proceeding pursuant to La.Rev.Stat. 40:1299.39.1 B(2)(b), is reinstated.
JOHNSON, J. dissents.
NOTES
[*] Philip Ciaccio, Justice Pro Tempore, sitting for Associate Justice Harry T. Lemmon.
[1] A McDonald cerclage procedure is described as follows:

An operation for the treatment of an incompetent cervix (abnormally dilated cervix during pregnancy) in which the cervix is encircled with sutures and drawn together (as with a purse string) to reduce the size of the cervical opening. (The suture or ligature is later removed to permit delivery.)
4 J.E. Schmidt, Attorneys' Dictionary of Medicine and Word Finder (1995)(emphasis supplied). The failure to properly perform the latter, underscored portion of the procedure removal of the stitchesis the malpractice at issue in this case.
[2] On March 13, 1997, Moses filed a damage suit in Fifteenth Judicial District Court. In response, the Louisiana Health Care Authority filed an exception of prematurity, noting that UMC is a qualified health care provider. Moses then voluntarily moved to dismiss that suit.
[3] LHCA, according to UMC's brief filed in this court, is no longer an existing entity, leaving UMC as the sole qualified health care provider against whom plaintiff's medical review panel proceeding, if timely, can proceed. UMC thus refers to itself as the sole defendant in its pleadings before this court. We likewise do the same.
[4] La.Rev.Stat. 40:1299.39.1 D(4) provides: "[u]pon request of any party, or upon request of any two panel members, the clerk of any district court shall issue subpoenas and subpoenas duces tecum in aid of the taking of depositions and the production of documentary evidence for inspection or copying, or both."

The other relevant statutory provision is La. Rev.Stat. 40:1299.39.1 B(2)(a), which provides: "[t]he state or a person, against whom a claim has been filed under the provisions of this Part, may raise any exceptions or defenses available pursuant to R.S. 9:5628 in a court of competent jurisdiction and proper venue at any time without need for completion of the review process by the state medical review panel."
That defendants elected to assert the exception of prescription in this discovery proceeding, as opposed to instituting a new proceeding is a distinction without a difference. If the exception is sustained, the result is the panel "shall be dissolved." La.Rev.Stat. 40:1299.39.1 B(2)(b). If the exception is overruled and if the plaintiff elects to proceed with a damage action, plaintiff will have to institute a separate suit under a new docket number. See Watson v. Lane Memorial Hospital, 99-0930 (La.5/28/99), 743 So.2d 676 (finding improper plaintiff's attempt to file their damage action under the discovery proceeding docket number and holding random allotment rule mandated plaintiff file new malpractice suit.) The procedural ramifications of defendants' utilization of the existing district court discovery proceeding to raise a pre-suit exception of prescription demonstrate that this case is distinctly different procedurally from Watson, contrary to the suggestion of a concurring judge in the appellate court.
[5] The trial court recited the following oral reasons for sustaining the exception:

[I]n this case she certainly had several visits back when they put in the stitches, took out the stitches, left the stitches back in 1991, and then up in 1996 they were discovered when they were removed. However, this court does not feel that this is the same type situation as Winder [v. Avet, 613 So.2d 199 (La.App. 1st Cir.1992), writs denied, 617 So.2d 907 (La.1983)]. It is [sic] the same type of continuing tort, and for those reasons the exception is granted.
[6] While the court of appeal acknowledges this court's recent pronouncement in Crump v. Sabine River Authority, 98-2326 at p. 9 (La.6/29/99), 737 So.2d 720, 728, which held that a "continuing tort is occasioned by unlawful acts, not the continuation of the ill effects of an original, wrongful act," it further noted that, unlike this case, Crump and South Central Bell both involved property damage.
[7] While the appellate court states July 7, 1997 as the date Moses' claim was filed, this is apparently a typographical error as the actual date it was filed is July 2, 1997, as correctly noted elsewhere in the appellate court's opinion.
[8] The other dissenting judge gave no reasons. Also, another judge concurred on the basis that asserting an exception of prescription was procedurally improper in the discovery proceeding invoked under La.Rev.Stat. 40:1299.39.1 D. That issue is addressed in another footnote in this opinion.
[9] The parties, supported by the appellate court's reasoning, couch this case as raising the writ grant consideration for conflicting appellate court decisions, Rule X, § 1(a)(1) of the Louisiana Supreme Court Rules. However, as more fully discussed in this opinion, this case, when properly viewed, does not present a true conflict among the circuits, but rather, it presents a significant, novel legal issue. The proper writ grant consideration raised here is Rule X, § 1(a)(2), which provides: "[a] court of appeal has decided, or sanctioned a lower court's decision of, a significant issue of law which has not been, but should be, resolved by this court."
[10] Contra non valentem is a judicially created exception to prescription based on the civil doctrine of contra non valentem agere nulla currit praescriptio, which means prescription does not run against a party who is unable to act. Crier v. Whitecloud, 496 So.2d 305, 307 n. 4 (La.1986)(on reh'g). Four categories of contra non valentem have been recognized. The first two categories are rarely invoked. In re Medical Review Panel Proceeding of Vaidyanathan, 98-0289 (La.App. 4th Cir.9/23/98), 719 So.2d 604, writ denied, 98-2674 (La.12/18/98), 732 So.2d 1238. As noted, the fourth category is equivalent to the discovery doctrine. Under the discovery doctrine, "prescription does not begin to accrue until the plaintiff should have discovered that he had a reasonable basis for pursuing a claim against a specific defendant." Frank L. Maraist & Thomas C. Galligan, Jr., Louisiana Tort Law § 10-4(c) at 224 (1996). The fourth category is embodied in Section 5628, which both codifies the discovery rule and legislatively overrules it to the extent it applies to medical malpractice actions filed more than three years from the date of the act, omission or neglect.

The most frequent application of the contra non valentem doctrine to medical malpractice actions involves the third category: debtor concealmentwhen the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action. Vaidyanathan, supra. While we have declined to decide whether this third category applies so as to extend the three-year repose period, we have decided that to the extent the third category could apply, it is limited to instances of fraudulent concealment, misrepresentation, fraud or ill practices. See Fontenot v. ABC Ins. Co., 95-1707 (La.6/7/96), 674 So.2d 960 (collecting prior decisions in which we have examined the facts to determine applicability of third category, concluded it factually inapplicable, and thus declined to resolve question if third category could apply; to wit: Taylor v. Giddens, 618 So.2d 834 (La.1993); Rajnowski v. St. Patrick's Hospital, 564 So.2d 671 (La.1990); Gover v. Bridges, 497 So.2d 1364 (La.1986); and Whitnell v. Menville, 540 So.2d 304 (La.1989)). Given plaintiff does not allege any such conduct on defendant's part, we again leave the issue unresolved.
[11] The Ohio courts have since overruled Gillette and adopted a discovery rule. See 1 David W. Louissell & Harold Williams, Medical Malpractice ¶ 13.02[4] at 13-61 (2000)(noting Ohio, the chief exponent of termination of relationship rule, has clarified its rule to provide statutory time limit commences to run (a) when patient discovers injury or (b) when relationship terminates, which ever occurs later).
[12] See Cole v. Celotex Corp., 599 So.2d 1058, 1065 (La.1992), explaining the unique nature of occupational disease cases, resulting from continuous tortious exposure causing a continuous processslowly developing hidden diseaseand contrasting such cases with traditional torts, involving damages resulting from a single, identifiable event.
[13] A trend in both the federal and state courts embracing this theory has been noted. Louissell & Williams, supra ¶ 13.02[3] at 13-49 to 13-51. In some jurisdictions, the theory is confined to continuing negligent treatment.

In its modern form, the continuing negligent treatment doctrine has been described as involving two major variables.
First, the continuing negligence might produce either a series of separately identifiable harms or it might produce only a single indivisible injury. Second, defendants may owe a duty to take affirmative steps to minimize harm to the plaintiff or they may not.... [W]hen the defendant owes a duty to the plaintiff to act affirmatively and fails to do so, and when that failure produces a single harm, or a series of harms that cannot be segregated from another, the defendant's negligence is continuing and the statute does not begin to run until some definitive event occurs.... [T]ermination of treatment, or the patient's discovery of the relevant facts, would be examples of such a definitive event. On the other hand, if the continuing negligence causes a series of separate harms, each one actionable, the statute of limitations may begin on each harm separately, so that the plaintiff might be barred as to earlier acts of negligence but not as to later ones.
1 Dan B. Dobbs, The Law of Torts § 220 at 562(2001) A noted exception to the continuing negligent treatment doctrine is that "when the defendant commits a single, isolated act of malpractice, as distinct from a course of treatment that counts as malpractice, the doctor's subsequent efforts to cure the malpractice does not toll the statute of limitations." Dobbs, supra § 200 at 563.
Even assuming the continuing negligent treatment doctrine could serve as a basis for tolling the three year repose period under Section 5628, it would not apply in the present case. Plaintiff's alleged malpractice falls squarely within the exception for a single, isolated act of malpractice. As noted elsewhere, we thus leave for another day the question of whether a form of the continuing negligent treatment doctrine can be invoked to enlarge the three year period.
[14] In Winder, the defendant-doctor misdiagnosed the plaintiff with pancreatic cancer; plaintiff underwent unnecessary radiation treatment and died as a result of the treatments given to fight the misdiagnosed cancer. Distinguishing Whitnell v. Silverman, 95-0112 (La.12/6/96), 686 So.2d 23, and Crier v. Whitecloud, 496 So.2d 305, 307 n. 4 (La.1986)(on reh'g), on the basis that in neither of those cases was there any further treatment, the Winder court reasoned:

This is not a case requiring the application of the doctrine of contra non valentem as were Whitnell and Crier. This is simply a case of a continuing tort. See South Central Bell Telephone Co. v. Texaco, Inc., 418 So.2d 531 (La.1982); Abrams v. Herbert, 590 So.2d 1291 (La.App. 1st Cir.1991). There was continuous action by Dr. Avet... which resulted in continuous damage to Winderinfection and liver failure brought about by the radiation treatment for cancer.
613 So.2d at 202. Hence, the Winder court held this continuing tort tolled the three-year repose period.
[15] The court in Page noted the possible applicability of the continuous treatment tolling doctrine as an alternative basis for its decision. 729 F.2d at 823 n. 36.